IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GRAMERCY EMERGING MARKETS FUND, BALKAN VENTURES LLC, AND RILA VENTURES LLC,<br><br>  *Plaintiffs,*<br><br>  v.<br><br>ALLIED IRISH BANKS, P.L.C., THE BULGARIAN AMERICAN ENTERPRISE FUND, AND FRANK BAUER,<br><br>  *Defendants*. | Case No.: 11-cv-05948<br><br>Honorable Joan B. Gottschall<br><br>Magistrate Judge Valdez<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

  Plaintiffs Gramercy Emerging Markets Fund ("GEMF"), Balkan Ventures LLC, and Rila Ventures LLC (collectively "Gramercy" or "Plaintiffs"), for their Complaint against Defendants Allied Irish Banks, p.l.c. ("AIB"), The Bulgarian American Enterprise Fund ("BAEF"), and Frank Bauer (collectively with AIB, and BAEF, "Defendants"), hereby allege as follows:

### THE PARTIES

  1. Plaintiff GEMF is a Cayman Islands Exempted Company incorporated in the Cayman Islands and having its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830.

  2. Plaintiff Balkan Ventures LLC is a limited liability company wholly owned by Plaintiff GEMF, a Cayman Islands Exempted Company incorporated in the Cayman Islands and having its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830.

  3. Plaintiff Rila Ventures LLC is a limited liability company wholly owned by Plaintiff GEMF, a Cayman Islands Exempted Company incorporated in the Cayman Islands and having its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830.

4. Defendant AIB is an Irish Public Limited Company with offices at 190 S. LaSalle Street, Chicago, Illinois.

5. Defendant BAEF is a not-for-profit corporation established by the U.S. Congress incorporated in Delaware with its principal offices at 333 West Wacker Drive, Suite 460, Chicago, Illinois.

6. Defendant Frank Bauer is an Illinois domiciliary who at all relevant times herein was the President and Chief Executive Officer of BAEF. Mr. Bauer was also the Chairman of the Management Board and Chief Executive Director of non-party Bulgarian American Credit Bank ("BACB") at all relevant times herein.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367. As described above, Plaintiffs are citizens of the Cayman Islands and Connecticut. Defendants are citizens of Ireland, Delaware and Illinois.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant BAEF is headquartered in Chicago, Illinois in the Northern District of Illinois and there is no district in which this action may otherwise be brought.

## NATURE OF THE ACTION

9. This action for breach of fiduciary duty, tortious interference with prospective business advantage, aiding and abetting, and conspiracy arises from Defendants' bad faith and unlawful refusal to offer to Plaintiffs a mandatory tender offer in connection with AIB's purchase of 49.99% of the shares of non-party BACB.

10. Plaintiff GEMF is an investment fund. Balkan Ventures and Rila Ventures are limited liability companies wholly owned by GEMF.

2

11. Prior to August 28, 2008, Plaintiffs acquired 3,436,623 shares of BACB, a Bulgarian bank established with U.S. taxpayer funds.

12. On August 28, 2008, AIB purchased 49.99% of BACB from BAEF at BGN 66.0 per share. At that time Plaintiffs held a sizable minority stake in BACB shares.

13. Under relevant Bulgarian law at the time of the purchase, an individual or entity purchasing majority control of a publicly traded company was required to make a tender offer to all minority shareholders at the time of the contemplated share purchase. The price of the mandatory tender offer was to be the same price as that paid by the buyer under the terms of the contemplated sale.

14. AIB, in conspiracy with BAEF, structured its purchase of BACB shares in such a way as to attempt to avoid the mandatory tender offer rule while nonetheless exercising *de facto* majority control over BACB.

15. Once Plaintiffs were notified of the potential sale of shares to AIB in May 2008 they contacted AIB and BAEF officials and notified them of Plaintiffs' intention to take advantage of the mandatory tender offer that would accompany AIB's purchase of BACB shares.

16. In violation of their fiduciary and other duties to Plaintiffs, Defendants AIB and BAEF refused to honor their obligations to allow Plaintiffs to participate in a tender offer concerning Plaintiffs' BACB shares.

17. As a result of Defendants' failure to make the required tender offer to Plaintiffs, Plaintiffs have suffered damages in at least the amount of the difference between the price Plaintiffs paid for their shares and the price AIB was required to offer to purchase Plaintiffs' shares at pursuant to the mandatory tender offer rule – a sum currently estimated at $40,861,447.47.

**FACTUAL ALLEGATIONS**

A.  **Seeking to Spur American Investment in Eastern Europe Following the Fall of the Iron Curtain, the U.S. Government Passes the SEED Act.**

18. In 1989, as the Communist Party's hold on power in Eastern Europe began to erode, the U.S. Government engaged in numerous activities in an effort to support the fledgling democracies that began to emerge from the era of Soviet domination. Among the methods contemplated for bolstering democratic governments was encouraging American investment in newly opened Eastern European economies, thereby "Westernizing" their economies and creating partnerships with Western nations, and in particular the United States.

19. As a means of encouraging American investment in Eastern Europe, and with the aim of assisting the former Soviet-bloc countries' transition from state-run to capitalist economies, in 1989 the U.S. Congress passed the Support for East European Democracy Act of 1989 ("SEED") Act.

20. According to the SEED Act, among its aims was encouraging American investment in Eastern Europe through the "liberalization of investment and capital" and "encouraging tax policies which provide incentives for economic activity and investment."

21. These goals were echoed by the statements of Members of the U.S. Congress during the debate leading up to the passage of the SEED Act. For example, Senator Lautenberg stated that the SEED Act would respond to the "plea" of Lech Walesa for "Western business investment." Senator Cranston offered support for the SEED Act by stating that the "best thing we can do is to provide incentives for investment and joint ventures in the economies

4

and the people of [Eastern Europe]." Their statements and others made clear that the SEED Act was designed to encourage American investment in Eastern Europe.

22.     In order to fulfill its aim of encouraging American investment in Eastern Europe, the SEED Act provided for the establishment of Enterprise Funds. These funds, established in various Eastern European countries, were U.S. taxpayer funded organizations designed to promote growth and American investment in Eastern European countries by themselves making investments in Eastern European countries. These investments were to encourage further private American investment by demonstrating that the former Soviet Bloc nations in which they were established had viable, investment-worthy, economies.

23.     In total, the U.S. Government established ten Enterprise Funds in Eastern Europe between 1990 and 1995. These funds were capitalized with approximately $1.2 billion in U.S. taxpayer money.

**B.     The U.S. Congress Creates the Bulgarian American Enterprise Fund Which Later Founds the Bulgarian American Credit Bank.**

24.     Pursuant to the SEED Act, in 1991 the U.S. Congress established the BAEF. According to the BAEF, its mission was to promote the development of the Bulgarian private sector and policies and practices conducive to such development. Promotion of the Bulgarian private sector would in turn encourage American investment in Bulgaria.

25.     Upon its founding, BAEF became headquartered in Chicago, Illinois.

26.     Upon information and belief, the Board of Directors of BAEF is comprised entirely of Unites States citizens.

27.     Using money from BAEF, in 1996 the BACB was founded in Sofia, Bulgaria. BACB has a full banking license issued by the Bulgarian National Bank. The purpose of founding the BACB by the U.S. Government was to foster democracy in Eastern Europe, a

5

mission the BACB was to accomplish by providing loans to small and medium sized businesses in Bulgaria.

### C. Plaintiffs, Relying on U.S. Government Backing for BACB, Purchase a Minority Stake in BACB.

28. On April 4, 2006 BAEF issued an IPO through which it sought to reduce its 65% stake in BACB to a 53.88% stake. This IPO directly encouraged American investment in Bulgaria by seeking to have investors take over ownership of a bank established with U.S. taxpayer funds.

29. Plaintiffs participated in this IPO and purchased approximately 3% of the outstanding shares of BACB. Plaintiffs did so in part in reliance on the fact that a significant portion of AIB's shares would be retained by BAEF, a U.S. Government funded organization headquartered in the United States.

30. The decision by Plaintiffs to invest in BACB was made by Plaintiffs' employees and representatives in the United States based on information accessed from or transmitted to the United States.

31. At the time of Plaintiff GEMF's purchase of shares in BACB, and throughout the period of GEMF's investment in BACB, approximately 75% of the investors in GEMF were American.

32. In addition to participating in the IPO announced on April 4, 2006, Plaintiffs subsequently purchased additional shares which increased their stake in BACB to roughly 26% (3,436,623 shares).

33. Plaintiffs' shares were purchased at an average cost of BGN 49.71 per share.

D.  **AIB Conspires With BAEF to Purchase a Controlling Interest in BACB and Attempt to Avoid the Mandatory Tender Offer Rule While Exercising *De Facto* Control Over BACB.**

34.  On February 18, 2008, BAEF announced that it had entered into an agreement to sell 49.99% of the outstanding shares of BACB to AIB for €216 million. This sale price valued the BACB at €432.8 million and equated to a price of BGN 66.0 per share.

35.  At the time BAEF held 53.88% of the outstanding shares of BACB.

36.  At the time of the transaction, pursuant to Article 149 of the Bulgarian Public Offer of Securities Act, a shareholder purchasing a majority stake in a publicly traded company was, at the time of the purchase, required to file at the Bulgarian Financial Supervision Commission a tender offer for purchase of all outside shares. The price paid for any shares redeemed under this mandatory tender offer rule was to be the same price paid by the new majority shareholder.

37.  The goal of AIB's purchase of 49.99% of the outstanding shares of BACB from BAEF was to gain *de facto* control over BACB while knowingly attempting to avoid the mandatory tender offer rule. This goal was confirmed by the public statement of Frank Bauer, Chairman of the Management Board and Chief Executive Director of the BACB in an article published in "CAPITAL" newspaper No. 9 of 2008. In this article Mr. Bauer was quoted as saying: "The decision to transfer below half of the capital and 3.89% to remain with BAEF is taken in order not to start immediately a procedure for tender offer for purchasing all shares. From now on [AIB's] plans are their plans and I cannot comment on what they are going to do."

38.  Prior to BAEF's sale of shares to AIB, Plaintiffs made repeated demands on Defendants that they abide by the mandatory tender offer rule and offer to purchase Plaintiffs' shares at the price to be paid by AIB. For example, on April 8, 2008, Robert Koenigsberger,

7

President and Co-Managing Partner of Gramercy Advisors LLC, the investment advisor for GEMF, sent a letter to Dermot Gleeson, then chairman of Defendant AIB, informing him of Plaintiffs' concerns that AIB's contemplated purchase of 49.99% of the outstanding shares of BACB would implicate the mandatory tender offer rule because of the potential for AIB to agree, explicitly or implicitly, with BAEF to vote their shares in a coordinated manner so as to allow AIB to exercise *de facto* majority control over BACB.

39. In a letter dated May 23, 2008 Mr. Gleeson, writing on behalf of AIB, summarily rejected Plaintiffs' concerns as to AIB's ability to control BACB and rejected Plaintiffs' contention that AIB's contemplated share purchase would trigger the mandatory tender offer rule.

40. Plaintiffs also expressed their strong concerns about BAEF's proposed sale of 49.99% of BACB's shares to AIB to BAEF, but to no avail. On June 5, 2008, Mr. Koenigsberger sent a letter to Joseph Borgatti, Chairman of the Board of BAEF. The June 5 letter expressed Plaintiffs' concerns that the sale of shares to AIB was being formatted in such a way as to leave AIB in *de facto* control of BACB through an arrangement with BAEF that would allow AIB to control its stake and that of BAEF.

41. Mr. Borgatti dismissed Mr. Koenigsberger's concerns in a letter dated June 18, 2008. According to Mr. Borgatti, BACB would take no steps to safeguard Plaintiffs' or any other minority shareholder's interests in light of the contemplated sale of 49.99% of BACB to AIB.

42. On August 28, 2008 AIB's purchase of 49.99% of BACB closed. After the sale, BAEF retained a 3.89% interest in BACB.

43. After its purchase of 49.99% of the outstanding shares of BACB, AIB was able to exercise *de facto* majority control over the bank through an explicit or implicit agreement with BAEF that BAEF would vote its shares in the same manner as AIB's. Although the full details of their arrangement can only be discerned through full discovery, there is strong circumstantial evidence of a pre-meditated agreement. Based on the publicly available records Plaintiffs have been able to obtain and review, after AIB acquired 49.99% of BACB on August 28, 2008, not once did AIB vote against a single proposal at a shareholder meeting. Furthermore, of the 31 votes taken at shareholder meetings in the time AIB was a BACB shareholder, in only two instances was it even mathematically possible for BAEF to have voted against a proposal (and therefore differently from AIB). In the two instances in which it was even mathematically possible for BAEF to have voted differently from AIB, the share percentage voting differently from AIB was 4.07% of the outstanding shares. Given that BAEF retained a 3.89% interest in BACB after its sale of 49.99% of BACB to AIB, it is highly unlikely that BAEF was the dissenting shareholder in these instances. Therefore, this voting pattern strongly suggests that BAEF was voting its shares in concert with AIB's shares pursuant to their agreement.

44. On May 16, 2011 AIB sold its interest in BACB. From August 28, 2008 until May 16, 2011, AIB exercised control over BACB through an agreement, explicit or implicit, with BAEF that allowed for AIB to determine the way in which BAEF shares would be voted.

E. **Defendant Bauer Personally Profited from the Sale of Shares to AIB.**

45. All members of the Management Board of BACB, including Defendant Bauer, were beneficiaries of BAEF's incentive program which was tied to profits on asset disposals.

46. Due to the windfall amounts they stood to receive from the sale of BACB shares to AIB, Bauer faced a conflict of interest concerning whether or not to sell BAEF's shares in

9

1231866

BACB to AIB. The conflict faced by Bauer was whether to recommend a share sale that would enrich himself but also violate local laws and minority shareholder rights, or to vote against the share sale and forego a personal pecuniary gain. Despite the clear risks of participation, Bauer participated in the vote to allow AIB to purchase the vast majority of BAEF's BACB shares. He therefore placed his own financial gain over the duties he owed to BACB minority shareholders.

47. Based on the notes to BAEF's 2007 Annual Report, BAEF valued its entire 53.88% stake in BACB as the transaction proceeds from a sale of 49.99% of its shares, less a 22% reduction for the effects of the incentive plan and transaction costs, or approximately €27.9 million. Assuming transaction costs were a standard 2% or €4.3 million, this provided an estimated payout of €23.6 million to the Management Board under the incentive program. Defendant Bauer shared in the payments under this highly lucrative program.

48. In contrast to the payments made to Defendant Bauer and other BAEF Management Board members, the U.S. Treasury received €18 million from the sale of BAEF's BACB shares to AIB.

49. The conflict of interest Defendant Bauer was operating under prevented him from considering the interests of all shareholders and placed his quest for a windfall payment ahead of his fiduciary duties.

**FIRST CAUSE OF ACTION**
**(Tortious Interference with Prospective Business Advantage)**
*(By Plaintiffs Against Defendant BAEF)*

50. Plaintiffs restate and reallege paragraphs 1 through 49 of the Complaint as if fully set forth herein.

51. Defendant AIB, as a person or entity purchasing a majority stake in a publicly traded company, was required to make a tender offer to all minority shareholders. The required

10

1231866

tender offer would allow minority shareholders to sell their shares to the prospective majority shareholder, here AIB, at the same per share price the majority shareholder was purchasing its majority stake for.

52. In August 2008, AIB purchased from BAEF 49.99% of the outstanding shares of BACB. AIB also entered into an agreement with BAEF which provided that BAEF would vote its shares in the same manner as AIB thereby allowing AIB to exercise control over BACB.

53. AIB's purchase of BAEF shares closed on August 28, 2008.

54. Therefore, AIB was required to make a tender offer as of August 28, 2008 to all minority shareholders.

55. BAEF was aware of AIB's obligation to make a tender offer to all minority shareholders in connection with its August 28, 2008 purchase of a controlling stake in BACB.

56. Plaintiffs had a reasonable expectation of entering into an agreement with AIB to sell Plaintiffs' shares in BACB to AIB as of August 28, 2008.

57. BAEF was aware of Plaintiffs' reasonable expectation that they would be able to sell their shares to AIB as of August 28, 2008 at the per share price paid by AIB for its controlling stake in BACB.

58. BAEF purposefully and intentionally interfered with and prevented Plaintiffs from realizing their expected sale of shares to AIB in connection with AIB's August 28, 2008 acquisition of a controlling interest in BACB by knowingly allowing AIB to purchase 49.99% of the outstanding shares of BACB with knowledge that AIB would circumvent the share purchase requirements under applicable law.

59. As a direct and proximate result of Defendants' interference with Plaintiffs' reasonable expectation that they would be able to sell their shares to AIB in connection with

11

AIB's August 28, 2008 purchase of BACB shares, Plaintiffs have incurred actual damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**
(*By Plaintiffs Against Defendant BAEF*)

60. Plaintiffs restate and reallege paragraphs 1 through 59 of the Complaint as if fully set forth herein.

61. From April 4, 2006 until the present Plaintiffs have been minority shareholders in BACB.

62. From at least April 4, 2006 until August 28, 2008, Defendant BAEF was the majority and controlling shareholder of BACB.

63. On account of their status as the majority and controlling shareholders of BACB, BAEF owed fiduciary duties to the other investors in BACB, including Plaintiffs.

64. BAEF breached these fiduciary duties by, among other things, entering to an agreement with Defendant AIB to allow AIB to purchase 49.99% of BACB with the agreement that AIB would obtain *de facto* control over BACB through this share purchase on account of BAEF's agreement to vote its shares in concert with AIB's shares.

65. BAEF further breached these fiduciary duties by allowing AIB to purchase 49.99% of BACB with the knowledge that AIB's purchase was deliberately structured in an impermissible and unlawful attempt to avoid the mandatory tender offer rule under applicable law.

66. As a result of BAEF's breaches of the fiduciary duties it owed to Plaintiffs, Plaintiffs are entitled to damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**
(*By Plaintiffs Against Defendant AIB*)

67. Plaintiffs restate and reallege paragraphs 1 through 66 of the Complaint as if fully set forth herein.

68. From April 4, 2006 until the present Plaintiffs have been minority shareholders in BACB.

69. From August 28, 2008 until May 16, 2011, Defendant AIB was the controlling shareholder of BACB.

70. On account of AIB's status as the controlling shareholder of BACB, AIB owed fiduciary duties to the other investors in BACB, including Plaintiffs.

71. AIB breached these fiduciary duties by, among other things, refusing to offer to Plaintiffs and all other minority shareholders a tender offer in connection with its August 28, 2008 purchase of *de facto* control over BACB as provided for by Bulgarian law.

72. As a result of Defendants' breaches of the fiduciary duties owed to Plaintiffs, Plaintiffs are entitled to damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Tortious Interference with Prospective Business Advantage and/or Breach of Fiduciary Duty)**
(*By Plaintiffs Against Defendants and Bauer*)

73. Plaintiffs restate and reallege paragraphs 1 through 72 of the Complaint as if fully set forth herein.

74. Defendant AIB, as a person or entity purchasing a majority stake in a publicly traded company, was required to make a tender offer to all minority shareholders. The required tender offer would allow minority shareholders to sell their shares to the prospective majority

13

shareholder, here AIB, at the same per share price the majority shareholder was purchasing its majority stake for.

75. In August 2008, AIB purchased from BAEF 49.99% of the outstanding shares of BACB. AIB also entered into an agreement with BAEF, with Bauer's approval, which provided that BAEF would vote its shares in the same manner as AIB thereby allowing AIB to exercise control over BACB.

76. AIB's purchase of 49.99% of BACB was wrongfully and intentionally made for the purpose of attempting to avoid the mandatory tender offer rule.

77. AIB's refusal to make a tender offer to all minority shareholders in connection with its purchase of 49.99% of BACB was a violation of the fiduciary duties AIB owed to the minority shareholders in BACB, including Plaintiffs.

78. At the time it sold AIB 49.99% of the shares of BACB, BAEF and Bauer were aware of AIB's wrongful intention to attempt to gain majority control of BACB while avoiding the mandatory tender offer rule.

79. With knowledge of AIB's wrongful intention, BAEF and Bauer provided assistance to AIB by selling AIB 49.99% of BACB. This knowing assistance on the part of BAEF substantially assisted AIB's tortious interference with Plaintiffs' prospective business advantage of taking part in a tender offer.

80. As a result of BAEF's actions which aided and abetted Defendant AIB's tortious interference with Plaintiffs' prospective business advantage, Plaintiffs have suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Civil Conspiracy)
*(By Plaintiffs Against All Defendants)*

81. Plaintiffs restate and reallege paragraphs 1 through 80 of the Complaint as if fully set forth herein.

82. Defendants AIB and BAEF, with the intention of allowing AIB to gain majority control over BACB without triggering the mandatory tender offer rule, agreed that BAEF would sell AIB 49.99% of BACB and further agreed that AIB and BAEF would vote their shares in the same manner so as to allow AIB to exercise *de facto* majority control over BACB.

83. This agreement and AIB's subsequent refusal to allow Plaintiffs, as minority shareholders in BACB, to participate in a tender offer in conjunction with AIB's purchase of 49.99% of BACB from BAEF, tortiously interfered with Plaintiffs' prospective business advantage in participating in a tender offer and was a violation of the fiduciary duties owed to Plaintiffs.

84. In furtherance of this conspiracy, Defendant BAEF, with Defendant Bauer's approval, took the overt act of selling 49.99% of BACB to AIB, and Defendant AIB took the overt act of purchasing 49.99% of BACB from BAEF. Also in furtherance of this conspiracy, Defendants AIB and BAEF have taken the overt acts of voting their BACB shares in concert pursuant to a predetermined arrangement.

85. As a result of Defendants' conspiratorial actions Plaintiffs have suffered damages in an amount to be determined at trial.

**RELIEF SOUGHT**

WHEREFORE, Plaintiffs pray for judgment as follows:

(i) For Plaintiffs' First, Second, Third, and Fourth Claims for Relief, damages in an amount to be determined at trial;

(ii) A judgment awarding Plaintiffs their costs, disbursements, pre- and post-judgment interests, and attorneys' fees;

(iii) Punitive damages; and

(iv) Such other and further relief as the Court deems just and proper.

Dated:    Chicago, Illinois
October 18, 2011

> By: /s/ Pei Y. Chung
> Gary M. Miller
> Pei Y. Chung
> GRIPPO & ELDEN LLC
> 111 South Wacker Drive
> Chicago, IL 60606
> Tel. (312) 704-7700
>
> Of Counsel:
>
> Sean F. O'Shea (pro hac vice to be filed)
> Michael E. Petrella (pro hac vice to be filed)
> O'SHEA PARTNERS LLP
> 521 Fifth Avenue, 25th Floor
> New York, New York 10175
> Tel. (212) 682-4426

16

1231866

**CERTIFICATE OF SERVICE**

I, Pei Yuan Chung, an attorney, hereby certify that on October 18, 2011, I caused a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** to be served on counsel of record via ECF pursuant to the General Order on Electronic Filing of the United States District Court, Northern District of Illinois.

/s/  Pei Y. Chung